# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

JANET HAMMOND, as the personal
representative of the estate of
Marjorie Hammond; DAPHNE
HAMMOND, as the personal
representative of the estate of
Marjorie Hammond; M.H.H.
IRREVOCABLE TRUST; JANET
HAMMOND; DAPHNE HAMMOND,

> *Plaintiffs-Appellees,*

v.

THE PACIFIC MUTUAL LIFE INSURANCE
COMPANY,

> *Defendant-Appellant.*

No. 02-1002

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, District Judge.
(CA-01-386-A)

Argued: October 30, 2002

Decided: January 23, 2003

Before WIDENER, WILLIAMS, and MOTZ, Circuit Judges.

---

Affirmed by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** Jeff Wayne Rosen, PENDER & COWARD, P.C., Vir-
ginia Beach, Virginia, for Appellant. Stephen Allan Saltzburg, THE

NATIONAL LAW CENTER, Washington, D.C., for Appellees. **ON BRIEF:** Lisa Ehrich, PENDER & COWARD, P.C., Virginia Beach, Virginia, for Appellant. James H. Falk, Sr., James H. Falk, Jr., Meredith N. Long, FALK LAW FIRM, Washington, D.C., for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

Pacific Mutual Life Insurance Company (Pacific Life) appeals from the district court's order granting summary judgment to Janet and Daphne Hammond[1] on their claim for breach of contract stemming from a life insurance policy issued to Marjorie Hammond in June of 1997. Finding no reversible error, we affirm.

### I.

Marjorie Hammond (Hammond) applied for a life insurance policy from Pacific Life in January of 1997. The application, for a policy that provided a death benefit of $750,000 with an annual premium of nearly $30,000, comprised two parts. Hammond completed most of "Part I" of the application on January 14, 1997, signing but not dating it. It was not possible to complete all of Part I at that time, however, because the trust which was to be the beneficiary of the policy had not yet been formed.

---

[1]The plaintiffs in the underlying action were: Janet and Daphne Hammond, in their capacity as personal representatives of Marjorie Hammond's estate; the M.H.H. Irrevocable Trust, and Janet and Daphne Hammond in their individual capacities. (J.A. at 16.) For ease of reference, we refer to the plaintiffs below, Appellees here, collectively as "the daughters."

Part I of the application included a declarations section containing the following provision:

> I represent that the foregoing answers and statements contained in Parts I and II are correctly recorded, complete, and true to the best of my knowledge and belief. I understand that:
>
> 1. Except as otherwise provided in any Temporary Insurance Agreement, no insurance will take effect before the policy for such insurance is delivered and the first premium paid during the lifetime(s) and before any change in the health of the Proposed Insured(s). Upon such delivery and payment, insurance will take effect if the answers and statements in this application are then true.

(J.A. at 100.) Pacific Life agent Michael Mullen, the representative in charge of handling Hammond's application, sent a copy of the signed but incomplete Part I form to Pacific Life's home office in California, along with a medical release form authorizing examination of Hammond's medical records.

Pacific Life required Hammond to undergo a physical examination before it would issue a life insurance policy. On January 22, 1997, Hammond was examined by an independent medical examiner (not a doctor) selected by Pacific Life. On that date, Hammond, apparently with the assistance of Pacific Life's independent medical examiner, also completed and signed "Part 2"[2] of the application, which asked her to provide information about her medical history. Pacific Life thereafter reviewed Hammond's medical records, her responses to Part 2 of the application, and the results of the independent medical

---

[2]Part I of the application, as is discussed in the text, references "Part II" of the application. The second part of the application Hammond completed, however, was entitled "Part 2" rather than "Part II." Before the district court, the parties disputed whether the "Part II" document referenced in Part I was the same as the "Part 2" document Hammond actually completed. The district court held that the question was irrelevant, and neither party has raised it on appeal.

examination. Upon completion of this review, Pacific Life approved Hammond's application, and on May 30, 1997 Mullen returned to Hammond's home to complete the process of issuing the policy. On that date, Janet and Daphne Hammond, as beneficiaries of the trust that Hammond designated as the beneficiary of the policy, signed and dated the Part I form that Hammond had earlier completed. Hammond was not asked on May 30 to sign or reaffirm any of the statements she made in either part of the application. Mullen accepted the completed Part I form and a premium check for $29,930. Thereafter on June 3, 1997, Pacific Life issued the policy, and Mullen delivered the policy to Hammond on June 11, 1997.

Between January 22, 1997, when she began the process of applying for life insurance, and June 11, 1997, when the policy was delivered, Hammond was examined by various doctors on a number of occasions. These doctors saw Hammond both for routine appointments and regarding specific ailments. The record reveals that Hammond saw at least six different doctors between January and June of 1997, in several instances referred from one to another. In the records of these visits, Hammond's doctors noted "emphysematous changes" in her lungs, chronic obstructive pulmonary disease, an irregular heart rhythm probably of the type known as "multifocal adrenal tachycardia," which is a type of heart rhythm common in persons with lung diseases, and anemia.

Hammond died on November 15, 1997. After her death, Janet and Daphne Hammond, as representatives of Hammond's estate, filed a claim for benefits under the policy with Pacific Life. In reviewing this claim, Pacific Life obtained and reviewed Hammond's medical records, including the records of her doctor visits during the period from January 22 to June 11. Pacific Life denied coverage in a letter to Janet and Daphne Hammond dated May 8, 1998. In the letter, Pacific Life stated that it was denying coverage because "the answers to the questions on the application in Part 2 . . . were no longer accurate as of May 30, 1997" and "Pacific Life relied upon the answers contained in the application in making its decision to offer coverage." (J.A. at 255.) Pacific Life noted in this letter that it reserved the right to change the reason for its denial of coverage at any time. (J.A. at 255.)

Dissatisfied with Pacific Life's decision to deny coverage, the daughters commenced this action in the United States District Court for the Eastern District of Virginia on March 9, 2001. In their complaint, the daughters asserted claims of breach of contract (Count One), promissory estoppel (Count Two), equitable estoppel (Count Three), common-law fraud (Count Four), negligence and gross negligence (Count Five), and bad faith (Count Six) against Pacific Life. They sought judgment against Pacific Life on the life insurance policy, as well as costs and attorneys' fees pursuant to Va. Code Ann. § 38.2-209 (Michie 2002). Pacific Life moved for summary judgment on all counts, asserting, inter alia, material misrepresentation as an affirmative defense. The daughters in turn moved for partial summary judgment on their breach of contract claim and to strike Pacific Life's material misrepresentation defense. In an opinion filed July 9, 2001, the district court granted Pacific Life's motion as to each of the daughters' claims except breach of contract and denied the daughters' motion to strike the affirmative defense of material misrepresentation. The district court took the remaining issues under advisement.

In a subsequent order issued August 23, 2001, the district court denied the parties' cross motions for summary judgment on the breach of contract and material misrepresentation issues. In the accompanying memorandum opinion, *Hammond v. Pac. Mut. Life Ins. Co.*, 159 F. Supp. 2d 249 (E.D. Va. 2002), the district court reasoned that the condition precedent to the policy's taking effect — the policy provision stating that no insurance would take effect unless the policy was delivered and the first premium was paid before there was any change in the proposed insured's health — was valid and enforceable. *Id.* at 258. The district court further noted, however, that the parties disputed whether the Part 2 form that Hammond had completed was attached to the policy that Mullen delivered to Hammond.[3] *Id.* at

---

[3]The daughters contended (and a jury ultimately found) that although Hammond had completed Part 2 of the application with the assistance of Pacific Life's medical examiner on January 22, 1997, Part 2 was not attached to the policy that Mullen delivered on June 11, 1997. On appeal, the daughters contend that Pacific Life discovered and attempted to conceal this fact by requesting the policy from the daughters and subsequently destroying it. In light of our resolution of the other issues presented in this appeal, we need not address this contention.

259. The statements contained in the Part 2 form, the district court concluded, were "necessary for Pacific Life to establish that there was a change in Hammond's health that prevented fulfillment of the condition precedent and imposed an affirmative duty on [Hammond and the daughters] to disclose new information regarding Hammond's health. Without Hammond's statements in Part 2, Pacific Life would have no datum from which to measure a change." *Id.* "Moreover," the district court continued, "Virginia Code Ann. § 38.2-3304(B)(2) would prevent Pacific Life from offering extrinsic evidence of Hammond's condition in January and then again in May, because this extrinsic evidence was plainly not 'endorsed upon or attached to' the policy when it was delivered."[4] *Id.* The district court thus found that it could not grant summary judgment to either party without resolution of the question whether Part 2 was attached to the policy when delivered. Accordingly, it ordered a trial on that issue.

Following a two-day trial, a jury found that Part 2 was not attached to the policy when delivered. In light of this verdict and its earlier conclusions, the district court entered judgment for the daughters on their breach of contract claim and ordered Pacific Life to pay damages in the amount of $750,000 plus interest. Pacific Life timely noticed this appeal.

## II.

In this appeal, Pacific Life asserts that Va. Code Ann. § 38.2-3304(B)(2) (Michie 2002) does not preclude reliance on "extrinsic evidence" to demonstrate the non-occurrence of a valid condition precedent, as the district court found, and, alternatively, that the district court erred in rejecting its contention that the duty of good faith and fair dealing precluded judgment for the daughters because of their failure to notify Pacific Life of changes in Hammond's health that would have influenced its decision to offer her coverage. We address each of these contentions in turn.

---

[4]Section 38.2-3304 is quoted in the text, *infra*, at 8.

A.

Pacific Life first argues that regardless of whether the Part 2 form was attached to the policy when delivered, it should have been allowed the opportunity to demonstrate, by reference to the independent medical examination conducted on January 22, 1997, and the records of Hammond's subsequent doctor visits between then and June 11, 1997, that Hammond's health "changed" between January and June of 1997, and accordingly that the condition precedent to the insurance contract's taking effect was not fulfilled.

The district court's conclusion on this issue is reflected in the memorandum opinion accompanying its order of August 23, 2001, in which it stated that Hammond's statements regarding her health in the Part 2 medical form "are necessary for Pacific Life to establish that there was a change in Hammond's health that prevented fulfillment of the condition precedent . . . . Without Hammond's statements in Part 2, Pacific Life would have no datum from which to measure a change." *Hammond*, 159 F. Supp. 2d at 259. As to Pacific Life's asserted ability to demonstrate a change by reference to statements or records apart from the Part 2 form, the district court stated that "Virginia Code § 38.2-3304(B)(2) would prevent Pacific Life from offering extrinsic evidence of Hammond's condition in January and then again in May, because this extrinsic evidence was plainly not 'endorsed upon or attached to' the policy when it was delivered." *Id.* Whether the district court correctly concluded that Pacific Life could not demonstrate a change in Hammond's health without reference to "statements" barred by § 38.2-3304(B)(2) is a question involving both statutory and contract interpretation, issues of law that we review de novo. *See United States v. Myers*, 280 F.3d 407, 416 (4th Cir. 2002) (review of questions of statutory interpretation is de novo); *Williams v. Prof'l Transp. Inc.*, 294 F.3d 607, 613 (4th Cir. 2002) (review of questions of contract interpretation is de novo). We bear in mind that "'[p]olicies of insurance in cases of doubt or ambiguity are to be construed liberally in favor of the assured, but they must be construed in accordance with their terms as are other contracts.'" *Combs v. Equitable Life Ins. Co.*, 120 F.2d 432, 436 (4th Cir. 1941) (quoting *Kennard v. Travelers' Protective Ass'n*, 160 S.E. 38, 39 (Va. 1931)).

A brief overview of the relevant contractual and statutory provisions is in order before commencing our analysis. As to the contract,

the Part I form states that "no insurance will take effect before the policy for such insurance is delivered and the first premium paid during the lifetime(s) and before any change in the health of the Proposed Insured(s). Upon such delivery and payment, insurance will take effect if the answers and statements in this application are then true." (J.A. at 100.) The Part I form was attached to the policy delivered to Hammond on June 11, 1997. The statute at issue, Va. Code Ann. § 38.2-3304, states that

> A.  Each individual life insurance policy shall contain a provision that the policy, or the policy and the application for the policy if a copy of the application is endorsed upon or attached to the policy when issued or delivered, shall constitute the entire contract between the parties.
>
> B.  The provision shall also state that:
>
> . . . .
>
> 2.  No statement shall be used in defense of a claim under the policy unless it is contained in a written application that is endorsed upon or attached to the policy when issued or delivered.

Va. Code Ann. § 38.2-3304 (Michie 2002).

Pacific Life first argues that the district court erred in concluding that Pacific Life could not rely on the records of the "independent medical examination" conducted on January 22, 1997 to show a change in Hammond's health. Pacific Life asserts that the district court erred in holding that § 38.2-3304(B)(2) prohibited use of these records because "the statute refers exclusively to 'statement[s] . . . contained in a written application,'" and the records of the January 22, 1997 examination do not meet that description. (Appellant's Br. at 14 (quoting Va. Code Ann. § 38.2-3304).)

The records of the January 22 examination consist of a one-page

medical questionnaire completed on that date by Hammond with the medical examiner's assistance (the questionnaire), and a second page containing the medical examiner's notes from a physical examination on that date (the medical examination form).[5] Pacific Life does not seriously suggest that the information on the questionnaire — which consists of Hammond's responses to various questions about her health — is not composed of "statements" made by Hammond as part of her application for life insurance, and we conclude the district court properly determined that Pacific Life was barred by § 38.2-3304(B)(2) from relying on the questionnaire, which was not attached to the policy when delivered, to defend its denial of the claim.

Whether the medical examiner's notes, which appear on the medical examination form, constitute such "statements" is a somewhat more difficult question. The information on the form is primarily Hammond's vital statistics, including height, weight, blood pressure, pulse, and whether or not any observable abnormality of any part of the body existed. Pacific Life suggests that the information on the medical examination form is not covered by § 38.2-3304(B)(2) because it is not composed of statements made *by Hammond*. (Appellant's Br. at 14 (arguing that § 38.2-3304 "does not address reliance on information acquired by the insurer apart from the insured's statements").) Section 38.2-3304(B)(2) does not by its terms apply only to statements by the proposed insured, however. Rather, its prohibition states simply that "[n]o statement" shall be used to defend the denial of a claim unless contained in an application that is attached to the policy.[6]

---

[5]What, precisely, constitutes "Part 2" of the application for insurance is not entirely clear from the Joint Appendix provided by the parties. Pacific Life contended at oral argument that only the questionnaire is Part 2, and that even absent clerical error the medical examination form would not have been attached to the policy. The daughters insist that both the questionnaire and the medical examination form are included in Part 2. We conclude that resolution of this question is immaterial to our consideration of the issues presented.

[6]Virginia Code § 38.1-393, the predecessor to § 38.2-3304, stated:

In each [life insurance policy] there shall be a provision that the policy, or the policy and the application therefor if a copy of the

Neither this court nor the Virginia courts have addressed the current version of § 38.2-3304 in a published opinion. There are, however, two opinions addressing its substantially identical predecessor. As Pacific Life points out, these cases involved statements made directly by the insured on a written application for insurance. *See Evans v. United Life & Accident Ins. Co.*, 871 F.2d 466 (4th Cir. 1989) (insured falsely stated he had not used tobacco within the last twelve months); *Southland Life Ins. Co. v. Donati*, 114 S.E.2d 595 (Va. 1960) (insured allegedly gave knowingly false and fraudulent answers to question contained in written application). Reading the statute as a whole and in light of the considerations expressed in *Evans* and *Donati*, however, we conclude that a medical examination form such as the form at issue here — whether or not the information it contains is comprised of "statements" by Hammond — is required to be attached to a policy of insurance if it is to be used to defend the denial of a claim under the policy.

In *Donati*, the Supreme Court of Appeals of Virginia (predecessor to the Supreme Court of Virginia) stated that, in enacting § 38.1-391,

> [i]t undoubtedly seemed fair to the Legislature that the policy holder should have in his possession, during his lifetime, such statements or representations which might be claimed, after his death, to have been fraudulent, so that he might

---

application is endorsed upon or attached to the policy when issued, shall constitute the entire contract between the parties, and that all statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties, and that no *such* statement or statements shall be used in defense of a claim under the policy unless contained in a written application and unless a copy of such statement or statements be endorsed upon or attached to the policy when issued.

*Southland Life Ins. Co. v. Donati*, 114 S.E.2d 595, 595-96 (Va. 1960) (quoting Va. Code Ann. § 38.1-393 (1950) (emphasis added)). In *Donati*, the Virginia Supreme Court of Appeals noted that § 38.1-393 "applie[d] only to statements of the insured." *Id.* at 596. The newer version of the statute omits the word "such" qualifying "statement," and is thus not clearly limited to statements by the insured.

know, or could be held to know, what the contract was
which he had entered into.

*Id.* at 597 (internal quotation marks and citation omitted). Further, the
court noted with approval the Louisiana Supreme Court's interpreta-
tion of the purpose of a very similar statute, quoting that court's state-
ment that "[t]he purpose of the law is that the insured shall have in
his possession during his lifetime, and that the beneficiary shall have
after the death of the insured, the entire evidence of the contract." *Id.*
(quoting *Fisette v. Mut. Life Ins. Co.*, 110 So. 880 (La. 1926)). Simi-
larly, we noted in *Evans* the generally accepted principle that "the
purpose of the statutes [such as section 38.1-393] is to require insurers
to attach, as of the date they decide to issue insurance, the statements
on which their decision relied." *Evans*, 871 F.2d at 470. The purpose
of § 38.2-3304 is thus clear — to inform the insured of the bases for
the insurer's decision to provide coverage and to ensure that the
insured is aware of any presumptions that have informed that deci-
sion.

The medical examination form at issue here was completed at
Pacific Life's insistence, and the examiner, though independent, was
selected and hired by Pacific Life. Accordingly, the examiner acted
as an agent of Pacific Life, not of Hammond, *see Metro. Life Ins. Co.
v. Hart*, 173 S.E. 769, 770 (Va. 1934), and was not obliged to share
the results of the examination with Hammond. Under these circum-
stances, the results of a medical examination such as that conducted
by the medical examiner in this case might well remain unavailable
to the applicant for insurance absent a requirement that the insurer
attach to the policy the form showing the results. Indeed, in this case
it is not at all clear that Hammond received or was otherwise notified
of the results of Pacific Life's examination, on which it now proposes
to base its proof of a change in her health. Such a result would run
contrary to the Virginia legislature's intent in enacting § 38.2-3304,
which was to ensure that the insured is aware of the assumptions that
form the "baseline" for the contract of insurance. In light of the Vir-
ginia legislature's plain intent in this regard, we must interpret § 38.2-
3304(B)(2) as prohibiting the use of the medical examination form
because it was not attached to the policy when delivered to Ham-
mond.

Pacific Life also argues that it should not have been denied the opportunity to prove a change in Hammond's health by reference to her medical records from the period before January of 1997 (i.e., records of a May 1996 visit to the Mayo Clinic) and the records of her subsequent examinations by various doctors between January and June of 1997. Pacific Life requested and reviewed Hammond's medical records through 1996 before issuing its policy, and contends that a comparison of those records to the records of Hammond's doctor visits in May of 1997 demonstrate a change in Hammond's health that renders the contract's condition precedent unmet. The district court apparently rejected this proposition, focusing only on Pacific Life's ability to demonstrate a "baseline" of health in January of 1997. *Hammond*, 159 F. Supp. 2d at 258.

The relevant contractual provision appears in Part I and was attached to the policy when delivered. This provision states that "no insurance will take effect before the policy for such insurance is delivered and the first premium paid during the lifetime(s) and before any change in the health of the Proposed Insured(s). Upon such delivery and payment, insurance will take effect if the answers and statements in this application are then true." (J.A. at 100.) In light of this provision, Pacific Life's argument is utterly without merit. The phrase "before any change in the health of the Proposed Insured(s)" must be interpreted as requiring that no material change in the proposed insured's health occur between (1) the date the application is completed and signed and (2) the date on which the policy is delivered and the first premium paid. In other words, a relevant change here would have to have occurred between January of 1997 and May of 1997.[7] Proof of a change in health by reference to medical records

---

[7]The daughters argue on appeal that the application was not "completed and signed" until May 30, 1997, the date when the application for insurance was finalized by completion of the section listing the M.H.H. Irrevocable Trust as the beneficiary and by the signatures of the daughters. Consequently, they assert, Pacific Life would have to show a change in Hammond's health between May 30, 1997 and June 11, 1997. Because the district court assumed that a relevant change could have occurred between January (when the application was initiated) and June of that year, because this approach is more favorable to Pacific Life, the party against whom the district court's ruling was made, and because in either event our conclusion would not be altered, we likewise make this assumption.

from May of 1996 and May of 1997, as proposed by Pacific Life, would be irrelevant, because that time frame would include the possibility that the change occurred, for example, between May and June of 1996, well before Hammond even applied for insurance with Pacific Life.

Without Hammond's responses on the questionnaire and the medical examination form, Pacific Life had no evidence of a "baseline" in January of 1997 from which to demonstrate a change in Hammond's health. None of the other medical records reflect examinations contemporaneous with her application for insurance, and the district court thus did not err in rejecting Pacific Life's contentions that it could show a relevant change in Hammond's health by reference to records other than the questionnaire and the medical examination form.

B.

Pacific Life next argues that the district court erred in rejecting its defense of good faith and fair dealing under Virginia law. Hammond, Pacific Life argues, had a duty to disclose the substantial changes in her health that occurred between January and June of 1997, and breached that duty when she did not disclose those changes when the policy was delivered.

In general, a duty of good faith and fair dealing applies to the parties to an insurance contract under Virginia law. *See, e.g.*, *Levine v. Selective Ins. Co. of America*, 462 S.E.2d 81, 84 (Va. 1995). Pacific Life asserts that this generalized duty of good faith and fair dealing is unaffected by § 38.2-3304. That section, Pacific Life argues, deals only with the duty of the insurer and leaves unaffected any duties imposed by the common law on the insured. (*See* Appellant's Br. at 21 ("By its express terms the statute places a duty on the *insurer* where the insurer defends against a claim based upon statements made by the insured. The statute is silent on the affirmative duty placed on the *insured* by the common law to 'make a full disclosure before accepting the policy, [where] the condition under which the application was made has changed.'" (quoting *Combs*, 120 F.2d at 438).) For the reasons explained below, we conclude that in the circumstances presented here the law of Virginia is clear: an insurer may not assert a misrepresentation or omission in an insured's application

as a defense to a claim under a policy if the insurer has not attached the application to the policy itself.

In *Donati*, the court addressed the impact of Va. Code Ann. § 38.1-393 on an insurer's proferred defense of "fraud in the procurement" of the policy. *Donati*, 114 S.E.2d at 596. The insurer alleged that the insured had made "knowingly false and fraudulent answers to questions contained in his written application" for life insurance," that "the policy would not have been issued had the questions been answered truthfully," that the "insured was not in good health at the time of the execution of the written application or when the policy was issued and delivered to him," and that "good health was a condition precedent to the policy becoming in force." *Id.* at 595 (internal quotation marks omitted). Interpreting § 38.1-393, the court rejected the insurer's contentions because the allegedly fraudulent statements had not been attached to the policy when delivered. The court found that the provisions of § 38.1-393, substantially identical to those of § 38.2-3304, were "indicative of an intent to restrict the insurer in the use of statements made by the insured in defense of a claim under the policy unless they be incorporated into the contract in the mode prescribed." *Id.* at 596-97. For that reason, and because the statute is "remedial, enacted for the benefit of the insured," *id.* at 596, the court found that the defense of "fraud in the procurement" was unavailable to the insurance company; an allegation of fraud, in other words, could not overcome the statute's bar to reliance on statements not attached to the policy. *Id.* at 599.

*Donati* thus held, under a substantially identical Virginia statute, that a defense of fraudulent misrepresentation was unavailable to an insurer where the insured was alleged to have made a false representation. Here, Pacific Life argues that its allegation is not of misrepresentation on the part of the insured, but rather of failure to provide information that would have influenced its underwriting decision. We have noted, however, the general principle that "the suppression of a material fact which a party is bound in good faith to disclose is equivalent to a false representation." *Moore v. Pilot Life Ins. Co.*, 86 F.2d 197, 199 (4th Cir. 1936) (citing *Stipcich v. Metropolitan Life Ins. Co.*, 277 U.S. 311 (1928)). Moreover, to adopt a distinction between failure to provide information and misrepresentation of information would undercut the *Donati* court's reasoning, as its opinion focused

on the limitation that the statute places on the insurer where it fails to attach an application containing an alleged misrepresentation. To hold that the same limitation does not apply where the "misrepresentation" is in fact an omission would create a senseless (and broad) exception to the limiting rule expressed in the statute. Accordingly, we conclude that the district court properly rejected Pacific Life's defense premised on the duty of good faith and fair dealing.

## III.

For the foregoing reasons the judgment of the district court is

*AFFIRMED*.